**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

John Doe, *et al.*,                          )
                                             )
            Plaintiffs,                      )    Case No.: 1:20-cv-00389
                                             )
            vs.                              )    Judge Michael R. Barrett
                                             )
Miami Township, *et al.*,                    )
                                             )
            Defendants.                      )
                                             )
                                             )

<u>**OPINION & ORDER**</u>

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment Against Defendant Miami Township (Docs. 42, 45, 54) and Defendants Miami Township and Joseph Braun's Motion for Summary Judgment (Docs. 43, 52, 57).[1]

## I.        BACKGROUND

**Facts Alleged in the Complaint.**  Plaintiff John Doe 1 ("Father"), a resident of Clermont County, Ohio, is the father of the three other Plaintiffs in this civil action: John Doe 2 ("Son"), Jane Doe 1, and Jane Doe 2.  (Complaint, Doc. 1 ¶¶ 6–9.)  Father is known to the Clermont County community through his involvement in the Clermont County Republican Central Committee.  (*Id.* ¶ 6).

---

[1] Plaintiffs tendered an *omnibus* brief in opposition to Defendants' motion and as a reply in support of theirs.  It was filed twice at the request of the Clerk to capture both events.  (See 08/25/2025 Notice of Correction (docs. 52 & 54 are identical)).

Defendant Miami Township is located in Clermont County.[2] Defendant Joseph Braun is Miami Township's Law Director. (*Id.* ¶ 11).

Father and Son had a dispute that escalated into a physical altercation. (*Id.* ¶ 13). This event, along with conversations with (and between) the Jane Does, was captured on the private security cameras in Father's house. (*Id.* ¶¶ 14, 17, 19). Father's ex-wife ("Ex-Wife"), who is the mother of the then-minor Plaintiffs, had access to the camera footage. (*Id.* ¶¶ 12, 15). She surrendered the footage to the Clermont County Children's Protective Services ("CPS") at its insistence. (*Id.* ¶ 15, 17). CPS investigated and ultimately shared the footage with the Miami Township Police ("MTPD"). (*Id.* ¶15). The MTPD pursued misdemeanor charges against Father in connection with the altercation. (*Id.* ¶ 16). Father entered into a plea agreement; eventually the charges were expunged. (*Id.* ¶ 20). Miami Township later produced the camera footage in response to a public records request and publicly posted it "without completely redacting or otherwise removing Plaintiffs' private conversations." (*Id.* ¶¶ 22, 24).

Plaintiffs bring suit for violation of their rights guaranteed by the First (Claim One) and Fourteenth (Claim Two) Amendments of the United States Constitution[3] as well as analogous provisions within the Ohio Constitution (Claim Three). (*Id.* ¶¶ 32–54). They also sue for invasion of privacy under Ohio common law (Claim Four). Defendants filed an Answer to Plaintiffs' Complaint (Doc. 4), followed by a Motion for Judgment on the

---

[2] "Community Profile," Miami Township, Clermont County OH, available at https://www.miamitwpoh.gov/profile.html (last visited 1/16/2026)

[3] Plaintiffs bring suit under 42 U.S.C. § 1983. (Doc. 1 ¶ 1; Civil Cover Sheet, Doc. 1-1 PAGEID 12). Section 1983 "is not itself a source of substantive rights," but, rather, "a method for vindicating federal rights elsewhere conferred[.]" *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

Pleadings (Doc. 17).[4]  After the close of discovery, the parties moved for summary judgment.  Plaintiffs ask the Court to award them judgment as a matter of law against Defendant Miami Township on their federal claims (only).  Defendants Miami Township and Joseph Braun ask the Court to award them judgment as a matter of law on all claims (federal and state) alleged against them in Plaintiffs' Complaint.

**Facts Established During Discovery.**  Father telephoned Ex-Wife after his altercation with Son.  (Doc. 41 *SEALED* PAGEID 353 (23:22–24), PAGEID 354 (26:17–27:25)).  She "checked the – the Amazon Cloud cam to see what had happened."  (*Id.* PAGEID 353 (23:25–24:1)).   Ex-Wife downloaded the video (to the hard drive on her cell phone) and then picked up Son.  (*Id.* PAGEID 353 (24:1–20), PAGEID 354 (26:3–16)).  The next day Son told a school counselor about the altercation, who, in turn, reported it to CPS.  (*Id.* PAGEID 354 (28:21–29:8)).  CPS called Ex-Wife and a social worker came to interview all three children.  (*Id.* PAGEID 354 (29:9–18)).  That social worker told Ex-Wife that she needed to provide the video to CPS or to the police, and, if she didn't, "the kids could potentially be put in foster care."  (*Id.* PAGEID 354 (28:21–25), PAGEID 354 (29:15–24)).  Ex-Wife emailed the video to the social worker.  (*Id.* PAGEID 355 (30:2–11)).  She did not provide it to anyone else,[5] including the MTPD.  She also did not speak to "anyone at the police station" or "anyone with Miami Township" about the altercation.  (*Id.* PAGEID 355 (32:3–13)).

---

[4] At Plaintiffs' request, the undersigned held oral argument on Defendants' Rule 12(c) motion.  (*See* 03/11/2021 NOTATION ORDER & 04/21/2021 Minute Entry).  It ultimately was denied as moot, because the Court determined that the legal issues raised therein "[we]re more appropriately decided on summary judgment, allowing for review of the evidentiary record developed by the parties during discovery."  (*See* 1/2/2026 NOTATION ORDER).

[5] Ex-Wife also sent the video to her mother.  (Doc. 41 *SEALED* PAGEID 355 (31:21–32:4)).

Among other duties, Lt. Greg Jenkins supervises the MTPD's records division. (Doc. 36 *SEALED* PAGEID 201 (4:11–14), PAGEID 202 (7:13–17)). "Routine" records requests are reviewed by Sherry Drake, a subordinate clerk who is "very versed in public records." (*Id.* PAGEID 202–03 (8:13–10:21)). Requests that require more scrutiny are reviewed by Jenkins as well as Drake. (*Id.*). And, sometimes, Miami Township Law Director Joseph Braun is consulted. (*Id.* PAGEID 203 (10:22–25)).

Q. So sometimes you produce records without asking for Mr. Braun's opinion?

A. Yes.

Q. And other times you ask for Mr. Braun's opinion?

A. Correct.

Q. And I'm assuming whatever opinion he gives you, you usually follow, correct?

A. There's no usually. We follow it.

Q. Okay. So whenever you ask Mr. Braun to review a records request, whatever – I'm not going to ask you what that advice is or anything. Whatever advice he gives you, you follow his advice?

A. That's correct.

Q. Okay. At that point if he were to say produce the records, would you produce the records?

A. Yes.

. . . .

A.. . . So if I – if I move [a public records request] up to [Mr. Braun] and he reviews it and tells me it's okay to go ahead and release the record, then, yes, I follow his advice and release the record.

. . . .

A. We get the request. We prepare the request in the manner in which we believe meets the public records law.

Q. Okay.

A. We provide that request as a package to Mr. Braun and say this is what we believe complies with public records law. He gets the

4

information.  He reviews it.  He either says, yes, I agree with you,
you've done everything you need to do with regard to redaction or he
says, no, I think you need to do more or you missed this or whatever.
Then when we make those corrections or redactions, we provide it
again back to him for a finished review.  And when he says, okay,
looks good, we release the record.

Q. Okay.  After he says, okay, looks good, you don't – you, Officer
Jenkins, do not reach out to any other person in the township before
producing them?

A. No.

(*Id.* PAGEID 203 (11:5–23), (12:12–16), PAGEID 204 (14:5–25)).

Jenkins also oversees investigations conducted by the MTPD.  (*Id.* PAGEID 201

(4:11–14), PAGEID 205 (18:12–14)).    Relevant here, the social worker (Kelsey

Schoenfelt) who visited Ex-Wife emailed him (on February 6, 2018) with an "investigation

summary" concerning the altercation that included links to three videos[6].  (*Id.* PAGEID

205–06 (19:10–24:6); Doc. 38 *SEALED* PAGEID 254).    Jenkins assigned MTPD

Detective Brent Higgins to the case.  (Doc. 41 *SEALED* PAGEID 205 (18:7–19:6),

PAGEID 206 (21:12–24)).  In the end, Father pled guilty to—and thus was convicted of—

a misdemeanor in January 2019.  By statute, he became eligible to apply for sealing and

expungement in January 2020, one year later.[7]

On November 1, 2019, a member of the public (Ed McCoy) requested "ALL

EVIDENCE" relating to the John Doe 1 domestic violence incident.  (*See* Doc. 38

*SEALED* PAGEID 267 ("This is a records request for all investigatory files, including

---

[6] Jenkins testified that he believes that the MTPD also received the videos from Ex-Wife, "but we can't
confirm that."  (Doc. 41 *SEALED* PAGEID 206 (24:15–23), PAGEID 215 (57:2–15)).  He denied that the
MTPD received the videos from the Clermont County Prosecutor's Office.  (*Id.* PAGEID 214 (55:10–22)).

[7] *See* Ohio Rev. Code § 2953.32(B)(1)(a)(ii), (b)(i).

video, pertaining to a 1/6/18 incident involving [John Doe 1] . . . . This incident became court case 18 CR 00512.")). The MTPD followed its "normal" procedure, gathering "all of the pertinent materials," and making "the necessary redactions[.]" (Doc. 36 *SEALED* PAGEID 208–09 (32:1–33:23)). This "package" was then sent to Law Director Braun for review. (*Id.* PAGEID 209 (33:24–34:13)).

In his capacity as Law Director, Joseph Braun is an employee of Miami Township. (Doc. 37 *SEALED* PAGEID 228 (13:14–14:23)). He had "multiple questions" about the records that Sherry Drake sent to him (at the behest of Lt. Jenkins). (*Id.* PAGEID 230 (21:3–22:13)).[8] That being the case, Braun delayed his response to McCoy, because "we were trying to work with [Father's] attorneys to see if there was any means by which we would not have to produce any of the video[s] versus a redacted version." (Doc. 37 *SEALED* PAGEID 237 (50:4–12)).[9] Asked why, Braun explained, "Well, on a very human level, I didn't – I did not want to give Mr. McCoy this information about [Father]. I didn't know what Mr. McCoy was going to do with it, whether he would disseminate it." (*Id.* PAGEID 237 (50:13–19)).[10] To this end, Braun added:

---

[8] (*See id.* ("A. There were questions of **how** we could produce them. There were questions of **whether** we should produce them. There were questions of **was this everything**. So, yeah, there were **multiple different angles of questions** that I raised based on what she gave to me.") (bold emphasis added)).

[9] (Doc. 37 *SEALED* PAGEID 238 (53:9–13) ("[Aaron] Maus contacted me[.]. . to tell me he was representing [Father and his three children] in an effort to try to find a way for us not to produce these records.")).

[10] According to Braun, shortly after McCoy's public records request was received, "The police chief reached out to [Father] as a courtesy. It's my understanding it was communicated to him and I know I communicated to him that I was going to see if there was a way that we could not produce this because, A, I felt sorry for him, and number two, I didn't know where this information was going to go. But, of course, I'm not permitted under law to ask someone who makes a request why they're requesting it. So I did have two separate telephone conversations with [Father] where I told him I was trying my best to make sure we got it right and that I was doing my legal research." (Doc. 37 *SEALED* PAGEID 240 (63:1–23)).

So in addition to all the legal research I did looking for a reason, I respected the fact that two other attorneys [Mark Tekulve and Aaron Maus][11] were researching this issue trying to find a way not to produce it. I wanted to cooperate with them and even suggested to one of them that I would be willing to wait and not respond to the request if they were going to seek an injunction. It was my idea that they seek an injunction. The reason for that is that they wanted to try to seal this case before we responded. Unfortunately, the judge [Jesse B. Kramig] did not permit that.

. . . .

There's no authority under the expungement law that would permit [the judge] to make an interim order. . . I don't practice criminal law but I know enough that you have to wait one year after your conviction, and that would have been January of '20, and I did not feel I could wait November of '19 all the way to January of '20 for that expungement to take place.

(*Id.* PAGEID 237 (51:3–15, 51:20–22, 52:1–7)). He ultimately produced the video to McCoy on November 20, 2019, with a (courtesy) copy to Attorney Tekulve. (*Id.* PAGEID 240 (62:1–18)).[12] The images of the children were blurred in the video and their names were "bleeped" out of the audio. (*Id.* PAGEID 238–39 (56:24–57:19)).[13] In addition,

---

Father's version of events is generally consistent with Braun's. He testified that he and his criminal defense attorney Mark Tekulve "had interactions with Mr. Braun, multiple interactions, through e-mail letting him know – citing Ohio Revised Code that he was violating Ohio law, protection law, potentially federal law if he continue[d] with that request before he released the request." (Doc. 39 *SEALED* PAGEID 293 (50:5–51:7)). He also remembered a call with Braun when he "explained to him that – that this request should not be filled because it violates privacy and went through all that with him and he responded back to me and said, I'm not sure, I have to -- he said, he didn't -- he wasn't sure he was gonna have to do it. He's stalling to try to look into it and I said, okay. He said, at minimum he will produce it in a format that's not easily readable. In other words, he'll – the law says he might have to produce it but he – he doesn't have to – doesn't say what format he has to produce it in, but he said he's still researching it, he's not sure he has to release." (*Id.* PAGEID 295–96 (61:20–62:20)).

11 (*See* Doc. 38 *SEALED* PAGEID 268–76).

12 Specifically, McCoy was emailed a link through which he could access Father's criminal file for the next four months, or until March 19, 2020, to include the redacted video. (*See* Doc. 38 *SEALED* PAGEID 258).

13 In this regard Braun advised McCoy that "[i]nformation related to the identity of a minor that is protected by state and federal law was not produced." (Doc. 36 *SEALED* PAGEID 210 (39:1–9), PAGEID 211 (43:18–44:16); Doc. 37 *SEALED* PAGEID 230–31 (24:6–25:16); Doc. 38 *SEALED* PAGEID 257–58).

Braun claimed to honor Father's request to redact any reference to Son's therapist. (*Id.* PAGEID 241 (65:10–66:13) ("I thought it was a decent thing to do.")).[14]

Miami Township received one other records request for the video, from Dillon Blevins who emailed Braun directly (on January 25, 2020). (Doc. 38 *SEALED* PAGEID 278). Braun objected to the request as being "vague and overly broad[,]" but advised that the record sought had been sealed by the Clermont County Municipal Court in an order dated January 9, 2020. (Doc. 37 *SEALED* PAGEID 241–42 (68:5–70:11); Doc. 38 *SEALED* PAGEID 279).

## II.     LAW & ANALYSIS

**Summary Judgment Standard.**  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution affects the outcome of the suit. *Id.*  On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but

---

[14] Father resolutely denies making any such request.  (Doc. 39 *SEALED* PAGEID 296–97 (65:13–68:8) ("Well, again, I never discussed redacting data.  I discussed not producing any of it.")).

must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49.[15]

This standard of review remains the same for reviewing cross-motions for summary judgment. *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441–42 (6th Cir. 2021); *see Harris v. City of Saginaw*, 62 F.4th 1028, 1032–33 (6th Cir. 2023) ("In review of the *defendant's* motion, we accept the *plaintiff's* view of the facts as true and draw all reasonable inferences in favor of the *plaintiff*[,]" whereas "in review of the *plaintiff's* motion, we accept the *defendant's* view of the facts as true and draw all reasonable inferences in favor of the *defendant*.") (italics emphasis in original).

## A. Plaintiffs' Partial Motion for Summary Judgment Against Defendant Miami Township

Plaintiffs ask the Court to award them judgment as a matter of law against Defendant Miami Township (only) on their federal claims.

**Municipal Liability Under § 1983.** A plaintiff suing under § 1983 must first establish the deprivation of a right secured by the Constitution caused by a person acting under color of state law. *Mallin v. City of Eastlake*, 755 F.Supp.2d 819, 830 (N.D. Ohio 2010). Once he does, "he then must establish the propriety of recovery from any particular party." *Id.* There are "distinct" requirements for individual and municipal liability. *Id.*

---

[15] Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"There is no vicarious liability under § 1983 for the alleged torts of a municipality's agent[ .]" *Mallin*, 755 F. Supp. 2d at 832 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "[T]o impose § 1983 liability upon a local government body, a plaintiff must show that the municipality **itself** is the wrongdoer." (*Id.* (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992)) (bold emphasis added).

A plaintiff can establish that a municipal defendant proximately caused a constitutional violation under any of five theories, one relevant here: a person with final policy-making authority made the decision. *See Mallin*, 755 F. Supp. 2d at 832–33 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986)[16]).

Unlike a state actor sued in his individual capacity, a municipality is not entitled to assert a "qualified immunity" defense. *Doe v. Sullivan Cnty., Tenn.*, 956 F.2d 545, 554 (6th Cir. 1992) ("Thus, **the dismissal of a claim against a[ state actor] asserting qualified immunity in no way logically entails** that the plaintiff suffered no constitutional deprivation, nor, correspondingly, **that a municipality** (which, of course, is not entitled to qualified immunity) **may not be liable for that deprivation**. At most it

---

[16] "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480. As the Supreme Court has explained:

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, **where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly**. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Id.* at 481 (bold emphasis added). "We hold that municipal liability under §1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

means that an officer in the defendant's position could reasonably have believed that the conduct in question did not violate law that was clearly established at the time.").  "When plaintiffs seek to recover from a municipality, there is no requirement that a particular right be 'clearly established[.]'"  *Mallin*, 755 F.Supp.2d at 832

It is undisputed that Miami Township Law Director Joseph Braun acted under color of state law and had the final say as to the public records request.  Therefore, if the Court determines that Braun deprived Plaintiffs of a right secured by the Constitution,[17] municipal liability will attach to Miami Township.

**Plaintiffs' First Amendment Claim**.  Plaintiffs contend that Miami Township violated their First Amendment right to intimate association when it published the video to McCoy.[18]

"The Constitution protects two distinct types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment."  *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) (citing, *inter alia*, *Roberts v. United States Jaycees*, 468

---

[17] "[T]here is no liability under *Monell* [*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)] without an underlying constitutional violation."  *Blankenship v. Louisville-Jefferson Cnty., Ky. Metro Gov't*, No. 25-5014, --- F.4th ---, 2025 WL 3638197, at *11 (6th Cir. Dec. 16, 2025) (cleaned up); *see Doe v. Sullivan Cnty., Tenn.*, 956 F.2d at 554 ("A determinative issue in § 1983 claims against municipalities is whether the plaintiff has suffered a deprivation of his constitutional rights.").

[18] (*See* Doc. 42 PAGEID 376–77 ("Here, Defendants intruded upon Plaintiffs' right to privately associate with others in their family unit free from the government's intrusion.  Indeed, the daughters in this case, Jane Doe 1 and Jane Doe 2, were not subjects of any criminal charges or family investigation, yet Defendants intruded in the minor daughters' private conversations for no purpose whatsoever."); Doc. 52 PAGEID 447 ("Defendants interfered with Plaintiffs' right to enjoy their familial relationships free from the government's intrusion into [their] private conversations.")).

U.S. 609, 617–18 (1984)). "Concerning intimate association, the Supreme Court 'has concluded that **choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State** because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.'" *Id.* (quoting *Roberts*, 468 U.S. at 617–18) (bold emphasis added).[19] "[T]he right to intimate association 'receives protection as a fundamental element of personal liberty.'" *Id.* (quoting *Roberts*, 468 U.S. at 618)).[20]

In a more recent decision, albeit unpublished, the Sixth Circuit clarified that the right to intimate association falls under the Fourteenth (rather than the First) Amendment. *Hartwell v. Houghton Lake Cmty. Schs.*, 755 F. App'x 474, 478 (6th Cir. 2018).[21] *See Doe v. Cuyahoga Cnty.*, No. 1:22-cv-01677, 2025 WL 2771526, at *5 (N.D. Ohio Sept. 29, 2025) ("*Hartwell* definitively 'shed light on which' constitutional provision, the First or Fourteenth Amendment, 'protects the right to intimate association' in general[,]" to include "**the intimate relationship between a parent and child**.") (bold emphasis added),

---

[19] The right to intimate association can also referred to as the right to privacy. *See Lawrence v. Texas*, 539 U.S. 558, 562 (2003).

[20] "[T]he constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." *Roberts*, 468 U.S. at 619. "Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Id.* at 619–20.

[21] "*Roberts* reasoned based on principles of culture and tradition, autonomy, identity, and ordered liberty. 468 U.S. at 617–20. With the help of contemporary caselaw, we now know that such reasoning animates substantive due process analysis. We thus find that *Roberts* recognized the right to intimate association under the Fourteenth Amendment." *Hartwell*, 755 F. App'x at 478.

*appeal dismissed*, No. 25-3892 (6th Cir. Dec. 22, 2025); *Katula v. Delaware Cnty. Bd. of Elections*, No. 2:23-cv-2199, 2024 WL 3384865, at *8 (S.D. Ohio July 11, 2024) (Sargus, J.) (citing *Hartwell*, "The Fourteenth Amendment protects a person's right to intimate association.").[22]  Plaintiffs, therefore, are not entitled to judgment as a matter of law against Defendant Miami Township with respect to Claim One ("Violation of First Amendment Rights") of their Complaint.

**Plaintiffs' Fourteenth Amendment Claims.**   Plaintiffs contend that Miami Township violated both their procedural and substantive due process rights when Law Director Braun produced the video in response to the McCoy public records request.

**Procedural Due Process.**  "The Fourteenth Amendment reads in part: 'nor shall any State deprive any person of life, liberty, or property, without due process of law,' and protects 'the individual against arbitrary action of government[.]'" *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 459–60 (1989) (quoting U.S. Const. amend. XIV, § 1 & *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)); *Cooperrider v. Woods*, 127 F.4th 1019, 1042 (6th Cir. 2025); *N.G. by & through V.G. v. Ohio Dep't of Developmental Disabilities*, No. 2:24-cv-2027, --- F.Supp.3d ---, 2025 WL 2880203, at *12 (S.D. Ohio Oct. 9, 2025) (Graham, J.) (citing *Cooperrider*).

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional;

---

[22] *See also Ford v. Brown*, No. 22-CV-12368, 2024 WL 1478187, at *5–6 (E.D. Mich. Jan. 26, 2024), *report & recommendation adopted*, 2024 WL 1332002 (E.D. Mich Mar. 27, 2024), *aff'g in part & dismissing appeal in part*, No. 24-1378, 2025 WL 1266780, at *2 (6th Cir. Jan. 6, 2025) (citing *Hartwell*, any right to "intimate association" argument "would have to rest under the Fourteenth Amendment"); *Dade v. Franklin Cnty., Ohio*, No. 2:17-cv-552, 2019 WL 2422247, at *3–4 (S.D. Ohio June 10, 2019) (Marbley, J.), *aff'd sub nom. Dade v. Baldwin*, 802 F. App'x 878, 883 (6th Cir. 2020) (*Hartwell* "conclud[ed] that the intimate association right arises out of the Fourteenth Amendment.").

what is unconstitutional is the deprivation of such an interest *without due process of law.*"
*Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (italics emphasis in original) (citations omitted).

> **The constitutional violation actionable under § 1983** is not complete when the deprivation occurs; it **is not complete unless and until the State fails to provide due process.** Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

*Id.* at 126 (bold emphasis added).[23]

"Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause and the laws and regulations of the States." *Doe v. Sullivan Cnty., Tenn.*, 956 F.2d at 556 (citing *Thompson*, 490 U.S. at 460). Plaintiffs here obviously rest their underlying liberty interest on state law. "Whether state law establishes a protected liberty interest requires a close examination of the language of the relevant statutes and regulations." *Id.* at 557 (citing *Thompson*, 490 U.S. at 461). "For instance, the use of 'explicitly mandatory language' in connection with 'specified substantive predicates' that limit the decisionmaker's discretion will support the conclusion that the State has created a liberty interest." *Id.* (citing *Thompson*, 490 U.S. at 463).

Under Ohio law, "[a] public children services agency **shall** disclose confidential information discovered during an investigation . . . to any . . . local government entity that

---

[23] "Due process, as this Court often has said, is a flexible concept that varies with the particular situation." *Zinermon*, 494 U.S. at 127.

needs the information to carry out its responsibilities to protect children from abuse[.]" Ohio Rev. Code § 2151.423 (emphasis added).  However, the "[i]nformation disclosed pursuant to this section is **confidential** and is **not subject to disclosure pursuant to [the Ohio Public Records Act] section 149.43** . . . of the Revised Code **by the agency to whom the information was disclosed**."  *Id.* (bold emphasis added).  Furthermore, "[t]he agency **receiving** the information **shall maintain the confidentiality of information disclosed** pursuant to this section."  *Id.* (bold emphasis added).[24]  The Ohio Public Records Act reinforces this "explicit mandatory language" through one of its express exclusions from the definition of a public record.  If release of a record "is **prohibited by state** or federal **law**[,]" it's not a public record under the statute.  Ohio Rev. Code §149.43(A)(1)(v)[25] (bold emphasis added); *see State ex rel. Clough v. Franklin Cnty. Children Servs.*, 144 Ohio St. 3d 83, 40 N.E.3d 1132, ¶¶ 17–20 (Ohio 2015) (child abuse investigation reports removed from mandatory disclosure under §149.43(B)).

The word "shall" appears twice in the text of § 2151.423.  CPS was *required* to disclose to MTPD—the "receiving" agency—the "confidential information [it] discovered during [its] investigation" of child abuse allegations against Father.  In turn, MTPD was *required* to "maintain the confidentiality of [the] information [CPS] disclosed[.]"  There is no discretion permitted by *either* the disclosing agency *or* the receiving agency.  And the Ohio General Assembly closed the loop by specifically instructing that when state law prohibits disclosure of information deemed confidential, that information is *not* a public

---

[24] *See also* Ohio Admin. Code 5180:2-33-21(B).

[25] The Ohio Public Records Act expressly excludes from public disclosure many other categories of records as well.  *See* Ohio Rev. Code § 149.43(A)(1)(a)–(tt).

record under § 149.43. In Plaintiffs' view, "this mandatory language gives rise to an interest subject to the protections of procedural due process." *Martin v. Voinovich*, 840 F. Supp. 1175, 1206 (S.D. Ohio 1993) (citing *Doe v. Sullivan Cnty., Tenn.*); *Keith v. Manis*, No. 3:12-cv-217-TAV-HBG, 2014 WL 4219600, at *3 (E.D. Tenn. Aug. 25, 2014) (same). They claim a protectible liberty interest in Miami Township complying with state law and, correspondingly, *not* producing the confidential video in response to a public records request.[26] They further claim to have suffered significant upset, embarrassment, humiliation, and shame in the wake of the video's "unauthorized dissemination."[27] (*See* Deposition of John Doe 1, Doc. 39 *SEALED* PAGEID 300–01 (79:21–85:5), 303 (93:4–95:23); Affidavit of John Doe 2, Doc. 51 *SEALED* PAGEID 434–35 ¶¶ 4–7, 9; Affidavit of Jane Doe 1, Doc. 49 *SEALED* PAGEID 430–31 ¶¶ 7–9; Affidavit of Jane Doe 2, Doc. 50 *SEALED* PAGEID 432–33 ¶¶ 7–11).

In essence, Plaintiffs seek redress for "reputational" injury. Unfortunately for them, though, "the Supreme Court has long held that people do not have a constitutional liberty or property interest in their reputations *alone*." *Segler v. City of Detroit, Mich.*, No. 23-

---

[26] Miami Township counters with the "fact" that Law Director Braun, "[a]t the time he did the production," didn't know that the videos came from CPS. (Doc. 45 PAGEID 405–06). True, Braun testified in his deposition that Lt. Jenkins told him they came from Ex-Wife. (Doc. 37 *SEALED* PAGEID 230 (22:14–23:24)). Looking past its hearsay element (*see* Doc. 37 *SEALED* PAGEID 230 (22:18–23:11)), Braun's testimony side-steps the unrefuted documentary evidence that *Jenkins*—also a final decision-maker regarding public records requests addressed to Miami Township—knew. Defendants admitted in paper discovery "that Miami Township Police Department came into possession of the video depicting [Father] in his home from **Clermont County Jobs and Family Services**." (Doc. 38 *SEALED* PAGEID 261) (bold emphasis added); Doc. 36 *SEALED* PAGEID 213–15 (52:13–57:15)). CPS is an arm of the Clermont County Department of Job and Family Services. https://djfs.clermontcountyohio.gov/ (last visited 1/16/2026).

[27] "Anyone who permits or encourages unauthorized dissemination" of information attendant to a child abuse investigation "violates section 2151.99 of the Revised Code and such a violation is a misdemeanor of the fourth degree." Ohio Admin. Code 5180:2-33-21(B)(3).

1897, 2024 WL 5135735, at *3 (6th Cir. Dec. 17, 2024) (citing *Paul v. Davis*, 424 U.S. 693, 711–12 (1976)) (italics emphasis original to *Segler*). To establish a due process violation, "the plaintiff[s] must show that the state actor deprived the[m] of some *other* interest 'previously held under state law' in addition to the asserted reputational injury." *Id.* (quoting *Paul*, 424 U.S. at 708) (italics emphasis original to *Segler*). By way of further explanation,

> Two Supreme Court cases show how this so-called "stigma-plus" test operates in practice. *Compare Paul*, 424 U.S. at 711–12 *with Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). On the one hand, *Paul* confirms that state actors need not provide any process before they harm a person's reputation alone. There, two police chiefs distributed a flyer to local businesses that included a list of recent individuals arrested for shoplifting. *Paul*, 424 U.S. at 694–95. The plaintiff's mug shot and name appeared on this list because the police had recently arrested him for shoplifting. *Id.* at 695–96. But prosecutors soon dismissed the charges against the plaintiff. *Id.* at 696. His employer later questioned him about the flyer but decided not to fire him. *Id.* The Court held that the plaintiff's due-process claim failed because he had not identified any harm apart from the reputational injury resulting from the distribution of the flyer. *Id.* at 711–12.
>
> On the other hand, *Constantineau* confirms that a loss apart from a damaged reputation can trigger the need for process. There, a police chief ordered the posting of a notice at all liquor stores that barred the stores from selling alcohol to the plaintiff pursuant to a state law. *Constantineau*, 400 U.S. at 434–35. The Court held that the Due Process Clause entitled the plaintiff to "notice and an opportunity to be heard" before the chief could post this notice. *Id.* at 436. Critically, the chief deprived the plaintiff of something *more* than just her good name. He used government power to legally bar her from "purchas[ing] or obtain[ing] liquor in common with the rest of the citizenry." *Paul*, 424 U.S. at 708; *see Constantineau* 400 U.S. at 437.

*Id.* at *3 (italics emphasis original to *Segler*). Review of Father's deposition (in its entirety), as well as the affidavits sworn by his children, indicates that this case looks less like *Constantineau* and more like *Paul*. In *Constantineau*, the state actor himself deprived the

plaintiff of the additional interest (the right to buy alcohol). *Constantineau*, 400 U.S. at 437. In this case, by contrast, Father and his children testified that *private parties* have deprived them—or have the potential to deprive them—of additional interests.

Son complains, "I have been the subject of negative comments online by strangers who have seen the video of me, and people online have made negative comments directly to me about the video." (Affidavit of John Doe 2, Doc. 51 *SEALED* PAGEID 435 ¶ 9). The daughters refer to (unnamed) friends, who, they believe, at the behest of their parents, "ghosted" them after learning about the fight captured on the video. (*See* Affidavit of Jane Doe 1, Doc. 49 *SEALED* PAGEID 430 ¶ 7; Affidavit of Jane Doe 2, Doc. 50 *SEALED* PAGEID 432–33 ¶¶ 9, 10). Father bemoans that fact that "[m]y kids have lost friends over this being publicized and being put out there." (*See* Deposition of John Doe 1, Doc. 39 *SEALED* PAGEID 304 (94:1–15)). For him personally, though, "The main thing here that isn't – you talk about humiliation but, there's, you know, there's also the distress of this which is I cannot run for a public office because they know that they have that. That's what this is. It's political. If I want to run for township trustee or if I want to run for an office, they're sitting on it." (*Id.* PAGEID 304 (95:24–96:7)).

The undersigned acknowledges that the analysis in *Segler* was used solely for the purpose of determining that the Detroit Chief of Police was entitled to qualified immunity. The Sixth Circuit chose not to answer the "important legal question on which Segler's case hinge[d]: May a plaintiff satisfy the 'plus' element of the Supreme Court's 'stigma-plus' test by showing that private parties harmed the plaintiff because of a state actor's false statements?" *Segler*, 2024 WL 5135735, at *4.[28] Still, its dictum is useful. The

---

[28] The Sixth Circuit more recently dodged this issue in *Pichiorri v. Burghes*, No. 24-3918, --- F.4th --- , 2025 WL 3687672, at *5 (Dec. 19, 2025). Citing *Segler*, "Pichiorri relies on the actions of *third parties*

plaintiff in *Segler* failed to cite "a single case that has adopted his stigma-plus theory tying the 'stigma' (reputational harms) from a state actor's defamation to the 'plus' (tangible injuries) from a private party's actions." *Id.* And while state defamation law is not implicated here, the reputational harm that resulted from Braun's (and thus Miami Township's) violation of Ohio's Public Records Act is the same. The Court accordingly determines that Plaintiffs cannot assert a procedural due process claim under these circumstances. Summary judgment in their favor (and against Defendant Miami Township) is therefore denied.

**Substantive Due Process.** *Hartwell*, recall, narrowed Plaintiffs' intimate association claim to the Fourteenth Amendment. They argue that Miami Township's release of the video constituted "a **direct and substantial** intrusion on their right to privacy within their familial home without government intrusion." (*See* Doc. 42 PAGEID 375) (bold emphasis added).

The adjective "direct and substantial" is a term of art in the vocabulary of constitutional law. If a policy creates a "direct and substantial" burden on an individual's right to intimate association, a court must apply strict scrutiny. *Dade v. Franklin Cnty., Ohio*, 2019 WL 2422247, at *5 (citing *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996) (citing *Zablocki v. Redhail*, 434 U.S. 374, 383–84, 388 (1978))). Otherwise, a simple rational basis is all that's necessary. *Id.*

---

(at the City of Hope [Medical Center] or the National Institutes of Health) who acted in response to the defamation. We have left open whether a plaintiff can assert a due-process claim where (as here) the public actor that allegedly defamed the plaintiff does not commit the additional injury that qualifies as the 'plus' under the stigma-plus test. . . . At day's end, though, we need not decide the question because we can reject Pichiorri's claim on narrower grounds." *Id.* (other citations omitted) (italics emphasis in original).

The Court begins with the premise that this, like *Hartwell*, is an "isolated action" case. 755 F. App'x at 479. Plaintiffs challenge no policy, but, rather, Braun's one-off decision to release the video as part of Miami Township's response to the McCoy public records request. This prompts a threshold inquiry as whether there is sufficient evidence for a reasonable jury to find that Miami Township's motivation was to punish Father (and, in turn, his children) for engaging in constitutionally protected conduct. *Id.* If the answer is yes, the analysis ends—the government action cannot survive *any* tier of scrutiny. *Id.* (citing *Montgomery*, 101 F.3d at 1127).

As will be developed respecting Plaintiffs' invasion of privacy claim, *see infra* pp. 24–29, there is little, if any, evidence of retaliation. Having established that a reasonable jury could not find that Miami Township released the video for "purely illegitimate reasons," the Court presses on with the tier-of-scrutiny analysis. *Hartwell*, 755 F. App'x at 480.

"[N]ot all government action affecting the right to intimate association receives heightened scrutiny." *Flaskamp v. Dearborn Pub. Schs.*, 385 F.3d 935, 942 (6th Cir. 2004). "Government action has a 'direct and substantial influence' on intimate association 'only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations].'" *Id.* (quoting *Anderson*, 371 F.3d at 882) (brackets in original)).

It's clear that Miami Township did not prevent Plaintiffs from forming (or continuing) an intimate relationship with each other. Therefore, a rational-basis review applies.

"To survive rational-basis review, a government action interfering with the right to intimate association must be a reasonable means to advance a legitimate governmental interest." *Hartwell*, 755 F. App'x at 480 (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 712 (6th Cir. 2001)). "The means chosen need not be the best for achieving these stated ends, but need only be rational in view of those ends." *Id.* (quoting *Montgomery*, 101 F.3d at 1130).

Miami Township clears what *Hartwell* calls "th[is] low bar." *See id.* Political subdivisions keep records that the members of the public are, for the most part, entitled to see under state law. It was in this context that the video was produced. Summary judgment in Plaintiffs' favor (and against Miami Township) is thus denied.

## B. <u>Defendants' Motion for Summary Judgment</u>

Defendants Miami Township and Joseph Braun ask the Court to award them judgment as a matter of law on all claims (federal and state) alleged against them in Plaintiffs' Complaint.

**<u>Plaintiffs' First Amendment Claim</u>**. Because the right to intimate association is not protected under the First Amendment, *see Hartwell v. Houghton Lake Cmty. Schs.*, 755 F. App'x at 478, Defendant Miami Township is entitled to judgment as a matter of law against Plaintiffs as to their Claim One. So, too, is Defendant Joseph Braun, who has raised the defense of qualified immunity.

Qualified immunity protects public officials from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Martin v. City of Broadview Heights*, 712 F.3d

951, 957 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). Courts follow a "two-tiered inquiry" to determine if a state actor is entitled to qualified immunity. *Id.* (citing *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 227)). The first step is to determine whether the facts alleged make out a violation of a constitutional right. *Id.* (citing *Pearson*, 555 U.S. at 232). The second is to ask if the right at issue was "clearly established" when the event occurred such that a reasonable official would have known that his conduct violated it. *Id.* These steps may be addressed in any order, but both must be answered in the affirmative for the case to proceed beyond summary judgment. *Id.* (citing *Pearson*, 555 U.S. at 236); *Segler*, 2024 WL 5135735, at *3 (citing *Pearson*, "We may address these two qualified-immunity elements in the order that makes the most sense for each case.").

In *Hartwell*, the Sixth Circuit determined that the First Amendment does not protect the right to intimate association. Thus, given that no federal constitutional violation has occurred, Braun is immune and likewise entitled to summary judgment with respect to Claim One.

**Plaintiffs' Fourteenth Amendment Procedural Due Process Claim.** As explained earlier on, Plaintiffs claim a protectible liberty interest in Miami Township not releasing a video (in response to a public records request) made confidential by statute. They seek redress for the ensuing reputational injury, aggravated by private parties shunning them or, in Father's case, subjecting him to possible blackmail by a fellow citizen with different political views. Relying on the instructive dictum in *Segler*, the Court

determined that no liberty interest attaches to these facts. Thus, Defendant Miami Township is entitled to judgment as a matter of law against Plaintiffs as to the procedural due process claim pled in Claim Two of their Complaint. So, too, is Defendant Joseph Braun, who is entitled to immunity because no federal constitutional violation has occurred.

**Plaintiffs' Fourteenth Amendment Substantive Due Process Claim.** The right to intimate association finds protection in the Fourteenth Amendment. Although Plaintiffs challenge an isolated action, there is no evidence of any retaliatory motive. Thus, as if a policy were being challenged, the Court must engage in a tier-of-scrutiny analysis. Because release of the video did not interfere with Plaintiffs' right to associate with one another, Miami Township need only offer a rational reason to justify its action. Attempting to comply with Ohio Public Records Act suffices. Thus, Defendant Miami Township is also entitled to judgment as a matter of law against Plaintiffs as to their substantive due process claim pled in Claim Two of their Complaint. So, too, is Defendant Joseph Braun, who is entitled to immunity because no federal constitutional violation has occurred.

**Plaintiffs' Claims Under the Ohio Constitution.**[29] The Ohio Supreme Court has "affirmed [its] autonomy under the Ohio Constitution to afford [its] people greater rights than those secured by the federal Constitution[.]" *State v. Mole*, 149 Ohio St. 3d 215, 74 N.E.3d 368, ¶ 20 (Ohio 2016). That said, Plaintiffs present no case law that the Ohio Constitution would offer greater protection in this instance. Nor do they address the

---

[29] "Plaintiffs plead each of the foregoing violations of the federal constitutional rights under the analogous provisions of the Ohio Constitution." (Complaint, Doc. 1 ¶ 47).

standard discussed in *Provens v. Stark Cnty. Bd. of Mental Retardation & Developmental Disabilities*, 64 Ohio St. 3d 252, 255, 594 N.E.2d 959, 961 (Ohio 1992). *See Graham v. Johanns*, No. 2:07-cv-453, 2008 WL 3980870, at *11 (S.D. Ohio Aug. 21, 2008) (Graham, J.) (citing *Provens* for the principle, "no private constitutional remedy where Ohio Constitution itself did not provide for a civil damage remedy"); *Mango v. City of Columbus*, Nos. 2:19-cv-3120, 2:19-cv-5282, 2020 WL 5247939, at *7 (S.D. Ohio Sept. 3, 2020) (Morrison, J.) (citing *Graham* for the principle, "the Supreme Court of Ohio has not recognized the existence of a private cause of action for damages under the Ohio Constitution"). Accordingly, Defendants are entitled to summary judgment with respect to Claim Three of Plaintiffs' Complaint.

**Plaintiffs' Invasion of Privacy Claim.** Plaintiffs bring an intentional tort claim under Ohio common law for invasion of privacy, presumably against both Defendants. Each is immune, though, under the Political Subdivision Tort Liability Act (codified in Chapter 2744 of the Ohio Revised Code).

Miami Township is a political subdivision. As such, and generally speaking,[30] it is immune from liability for acts or omissions connected with governmental or proprietary functions. Ohio Rev. Code § 2744.02(A)(1), (2). A government function is one that the Ohio General Assembly "mandates a political subdivision to perform." *Id.* § 2744.01(C)(1)(x). Records kept by a township are "public" subject to certain statutory exemptions. *Id.* § 149.43(A)(1)(a)–(bbb).

---

[30] Ohio Rev. Code § 2744.02(B) lists five exceptions to the general immunity granted to political subdivisions, none of which are applicable here.

Plaintiffs argue that the Act does not provide political subdivisions immunity from "[c]ivil claims based upon alleged violations of the constitution or statutes of the United States[.]"  This notion is neither here nor there, because Plaintiffs' invasion of privacy claim is brought under *Ohio common law*.  Accordingly, Miami Township is protected under the Act.

Law Director Braun (in his individual capacity) also is protected under the Act.  As an employee of a political subdivision, he is immune from liability unless his acts were manifestly outside the scope of his employment or official responsibilities *or* were "with malicious purpose, in bad faith, or in a wanton or reckless manner[,]" *or* unless a different section of the Ohio Revised Code "expressly impose[s]" civil liability[31]. *Id.* § 2744.03(6)(a)–(c).

The only applicable exception here is the second one.  Plaintiffs alleged in their Complaint that Father and Braun "have had a contentious political history," and that Father "is a known critic of Braun as an individual and public official."  (Complaint, Doc. 1 ¶ 23).  *Id.* § 2744.03(6)(a)–(c).  Careful to draw all reasonable inferences drawn in Plaintiffs' favor, the Court finds that the facts adduced during discovery fall short of these allegations.  They also don't lend themselves to "malicious purpose," "bad faith," or "wanton or reckless" conduct.

---

[31] Notably, "[c]ivil liability shall not be construed to exist under another section of the Revised Code merely because that section **imposes a responsibility or mandatory duty upon an employee**, because that section **provides for a criminal penalty**, because of a general authorization in that section that an employee may sue and be sued, or because the section **uses the term 'shall' in a provision pertaining to an employee**." *Id.* § 2744.03(6)(c) (bold emphasis added).

Start with the reality that a *third party*, Ed McCoy, made a public records request. There is no evidence that Braun was in cahoots with McCoy. Braun acknowledged that he "kn[e]w of" MCoy, a resident of Amelia: "I know him only as an individual who filed record requests in Amelia and was involved in government, I guess, in Amelia." (Doc. 37 *SEALED* PAGEID 235 (42:13–43:4)). "[A]t the time I was representing Amelia, I probably could have identified him; but as I sit here today, I have no recollection of what his appearance is." (*Id.* PAGEID 235 (43:6–17)).[32]

Above all, though, there is no record evidence that Father and Braun had a "contentious political history" prior to the release of the video. (Doc. 39 *SEALED* PAGEID 294 (56:11–20) ("Q. Did you – do you know Mr. Braun personally? A. **I did not at that time.** Q. Okay. I mean, had you met him before, anything like that? A. No. **And I really don't know him still.** He just serves on the [Clermont County Republican] Central Committee as well. Q. Oh, okay. That – A. **I just know the name.**") (bold emphasis added)). Father denied making derogatory comments about Braun (publicly on social media) "before this case[.]" (*Id.* PAGEID 299 (77:14–17)).

We know Father takes issue with Braun producing the video at all. Alternatively, he challenges the form in which it was produced. Both Father and Braun testified to the option of producing the video on a disc rather than in an electronic file. Father insists that Braun floated a workaround, producing the video on a CD that McCoy more than likely wouldn't be able to open.[33] Braun doesn't outright deny this. He concedes he originally

---

[32] Father, on the other hand, testified that McCoy "ha[d] posted against me multiple times on social media." (Doc. 39 *SEALED* 293 (51:25–53:7)).

[33] (*See* Doc. 39 *SEALED* PAGEID 298 (73:11–21) (A. . . . This could have very easily been produced, which I was told by Mr. Braun in that phone conversation, in a format that would be very difficult for somebody to get a player to play it and be on, like, an actual media and this wasn't just for – put on a CD.

represented to McCoy that he would produce the records "on a disk because that's how I typically would provide any kind of electronic data to someone in my other communities[34]; but I'm not always, as I indicated, involved in Miami Township's record requests. So I later found out we couldn't not produce them on a disk to him so we had to do it in a link through what I was told is called evidence.com which is a software program that is proprietary to Axon." (Doc. 37 *SEALED* PAGEID 236 (45:16–46:2)).[35]

Father hypothesizes that Braun reneged "[b]ecause there were some personal things that were released on Mr. Braun in – in the Clermont Couty GOP that were very – not very nice and I think that he is very upset about it." (Doc. 39 *SEALED* PAGEID 299 (76:11–15)). Father denies any role in the release but presumes that Braun holds each member of the Central Committee, himself included, responsible. (*See id.* PAGEID 299

---

A CD makes it a little more difficult to distribute versus me putting it online where I can just type in a code and everybody in the world can access it.); *id.* PAGEID 299 (74:1–75:9) (Q. . . . I mean, wasn't the code only produced to Mr. McCoy and to you? A. It was produced to Ed McCoy and myself. Mr. McCoy could e-mail that code to anybody that didn't request a record and they could access it in another state, another country, doesn't matter. That one person can then take that code, hand it out to three or four different people. It's the ease of information, accessibility. It didn't have to be given that easy. Q. So, I mean, if it had produced on a CD, I mean, could he have simply uploaded it and done the same thing? A. That's more difficult especially if you put it in a different format that not every single player in the United States can play which is what Mr. Braun stated he would do. Q. Okay. And you think that would have been compliant with a public records response? A. Absolutely. The records request say to produce the record doesn't say what format. Q. Okay. And you don't – you don't believe it has to be in a format that's viewable by the record requester? A. It could be viewable just you have to have the right player to play it. Q. If they don't have that player, would it be viewable? A. This is – these are your client's words, ma'am. These are his words.).

[34] Braun has practiced municipal law for more than 20 years, representing approximately 15 government entities. (Doc. 37 *SEALED* PAGEID 227 (11:17–25)).

[35] (*See id.* PAGEID 235–36 (44:25–47:11) ("So I know this was a point of contention for [Father]. Obviously under Ohio law someone making a record request can choose the format in which they receive those records as long as that's the format in which they're retained by the entity. . . . [W]e had to place it into the Axon software in order for us to edit it and then provide a link to Mr. McCoy that he could view it on. It would violate the Open Records Act in my opinion for us to edit this in some format and give it to Mr. McCoy that he could not view. So it had to be essentially what I'll call self-executing, meaning you click on it, you see it or you watch it in this case.")).

(76:16–23), (77:6–13)).  He concedes, though, "**I don't even recall** when I even found out about the information that was released on him **if it were even before this case or not.**  I don't recall."  (*See id*. PAGEID 299 (77:21–25) (bold emphasis added)).  Needless to say, material facts do not arise out of conjecture.  *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016) ("[A] 'mere scintilla' of evidence will not be enough for Plaintiffs to withstand summary judgment.").

Malicious purpose is "the willful and intentional design to injure or harm another, generally seriously, through unlawful or unjustified conduct."  *Jones v. Norwood*, No. C-120237, 2013 WL 454909, at ¶ 42 (Ohio App. 1st Dist., Feb. 6, 2013) (citing *Chaney v. Norwood*, 189 Ohio App. 3d 124, 937 N.E.2d 634, ¶ 11 (2010); *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 90, 658 N.E.2d 814, 820–21 (1995)).  Bad faith evinces a "dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another."  *Id.* (quoting *Cook*, 103 Ohio App. 3d at 90–91).  "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result."  *Id.*, at ¶ 43 (quoting *Anderson v. City of Massillon*, (2012) 134 Ohio St. 3d 380, 983 N.E.2d 266, syll. ¶ 3).  "On the other hand, '[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another which is unreasonable under the circumstances and substantially greater than negligent conduct.'"  *Id.* (quoting *Anderson*, 134 Ohio St. 3d 380, syll. ¶ 4).

As already discussed, in advance of approving Miami Township's release of the video to McCoy, Law Director Braun engaged in his own public records research and

28

consulted both with Father *and* Father's attorneys, whom he encouraged to do the same. At bottom, Father believes that "Mr. Braun could have done more here to help and he turned a blind eye and didn't." (Doc. 39 *SEALED* PAGEID 299 (76:24–77:5)). As a matter of law, "turning a blind eye" is not the equivalent of acting with malicious purpose, in bad faith, or with wanton or reckless disregard. Accordingly, Defendants are entitled to summary judgment with respect to Claim Four of Plaintiffs' Complaint.

## III.    CONCLUSION

To conclude, Plaintiffs' Partial Motion for Summary Judgment against Defendant Miami Township (Doc. 42) is **DENIED** and Defendants Miami Township and Joseph Braun's Motion for Summary Judgment (Doc. 43) is **GRANTED**.

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court